**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Gerald ROJAS, Sr., Defendant-Appellant.**

**No. 75–3760.**

United States Court of Appeals,
Fifth Circuit.

Aug. 20, 1976.
Rehearing Denied Oct. 1, 1976.

---

Paul Antinori, Jr., Barry A. Cohen, Tampa, Fla., for defendant-appellant.

John L. Briggs, U. S. Atty., Terrance Smiljanich, Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before WISDOM and MORGAN, Circuit Judges, and LYNNE, District Judge.

LEWIS R. MORGAN, Circuit Judge:

Appellant Gerald Rojas, Sr. was convicted of possession of a controlled substance, cocaine, with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and of conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. § 846. He assigns four grounds as error requiring reversal. We affirm.

I. *Facts.*

Viewing the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the jury could have found the following: On February 8, 1975, two Tampa, Florida undercover police detectives, Hartzner and Larson, met Stephen Charles Alfonso to attempt to purchase narcotics from him. Although no narcotics transaction occurred that day, Alfonso sold some counterfeit money to the detectives and arranged to meet them again at a predetermined street intersection on February 12.

At about 11:00 p. m. February 12, Hartzner, Larson, and Alfonso met as planned. The detectives asked whether Alfonso could supply them with cocaine, whereupon he left for about fifteen minutes and returned with a small sample of the drug. The three agreed to meet at the same place at 1:00 a. m. February 13 in order to complete the sale of half an ounce of cocaine for $625.

Hartzner and Larson met Alfonso, who was accompanied by appellant's nephew Richard "Chicky" Valdez, as scheduled. The detectives delivered $625 and Alfonso and Valdez delivered one quarter ounce of cocaine, directing the detectives to follow them to a new location for delivery of the other quarter ounce. This new location was two to four blocks from the house at 3010 West Laurel Street in Tampa where appellant, his wife Melba, and his stepson Jose Garcia lived. When the four met at the new location Valdez left in an automobile with the money, returned about five minutes later, and delivered the second quarter ounce.

The detectives next met Alfonso at his residence about 6:40 p. m. February 15, at which time they discussed with him the purchase of a full ounce of cocaine. Alfonso told the detectives that he would have to check to see whether he could procure an ounce and that the detectives should meet him at a shopping center at 8:00 p. m. that evening. Alfonso then contacted Valdez, and at about 8:00 p. m. the two of them drove to the house at 3010 West Laurel Street, which Valdez identified to Alfonso as his source's house. Valdez went inside the house alone, returned a few minutes later, and told Alfonso that "the old man" was taking a shower and that they should return later. Alfonso and Valdez then met the detectives, told them that their source was taking a shower, and agreed to meet later at Alfonso's residence.

Alfonso and Valdez returned to the house at 3010 West Laurel Street. Valdez again went inside alone, returning a few minutes later with a quantity of cocaine. At about 9:30 p. m. Alfonso and Valdez met Hartzner and Larson at Alfonso's residence, where the detectives delivered $1,200 and were given an ounce of cocaine. Valdez then left to return some extra cocaine to his source and was followed by a police surveillance team back to the house at 3010 West Laurel Street.

Later the same night Ernest Spencer, an informant for the State Attorney's office at Gainesville, went to Valdez' residence with two other persons to negotiate for the purchase of some cocaine. At about 1:00 a. m. the next morning, February 16, Valdez, Spencer, and the others drove to the house at 3010 West Laurel Street. Valdez went inside alone, spoke with someone in the house, returned to the car, and announced that his "uncle's got plenty of coke but he's just to [sic] plum out tonight to do any business." Later the same morning appellant Rojas met Valdez, Spencer, and the others at Valdez' residence. There Rojas personally delivered an ounce of cocaine to Spencer's companions in return for $1,100. At this time the five men discussed the possibility of further transactions for a pound or more of cocaine, with Valdez repeatedly stating that, "My uncle don't sell no bad drugs."

On February 21 a team of law enforcement officers executed a search warrant on the house at 3010 West Laurel Street. There, concealed under the seat of a lounge chair in the "Florida" or living room, they discovered a bag containing seven ounces of cocaine. They also found a set of scales of a kind suitable for weighing drugs in Rojas' and his wife's bedroom and a quantity of marijuana in the stepson's bedroom. After the search, as Detective Hartzner was about to leave the house carrying the cocaine, appellant asked him whether he could leave "half the stash." Hartzner declined.

A federal grand jury indicted appellant, Alfonso, and Valdez on February 27, 1975. On February 28 Alfonso pleaded guilty to conspiracy to possess cocaine with intent to distribute. Valdez' case was severed from appellant's, and Valdez was convicted on the same charge July 8, 1975.

Appellant's trial began July 15. The principal witnesses for the government

were Hartzner, Alfonso, and Spencer; Valdez did not testify. A government expert testified that chemical analysis of four cocaine samples—the two quarter ounces purchased February 13, the ounce purchased February 15, and the seven ounces seized in the search February 21—revealed such a similar and unusual combination of cocaine and other substances that there was a "high degree of probability" that the four samples once had been part of a single mixture. Appellant presented evidence of an alibi for the evening of February 15. The jury retired for deliberation on the afternoon of July 17 and returned its verdict of guilty on both counts two hours later. Appellant was sentenced to concurrent ten-year terms, plus the mandatory special parole term.

## II. *Voir Dire.*

■■■ Appellant's first assignment of error complains of the district court's refusal to ask prospective jurors on the voir dire to state their feelings concerning persons charged with drug related crimes. Appellant filed, together with his new trial motion, an affidavit of the jury foreman, Bobby Hornsby, which stated that Hornsby had helped organize and had served on an organization called the Reach Out Crisis Center, the purpose of which "was to help people on drugs as well as other social type difficulties." The affidavit further stated that if appellant's requested voir dire question had been asked, Hornsby would have made known his activities with this organization. Appellant's counsel state that if this information had been elicited, they would have excused this juror.

The district court may, of course, choose to ask counsel to submit proposed questions and conduct the voir dire itself. Fed.R. Crim.Pro. 24(a). The scope of the voir dire is committed to the sound discretion of the trial judge, *United States v. Nell*, 526 F.2d

1223, 1229 (5th Cir. 1976); *United States v. Gassaway*, 456 F.2d 624, 626 (5th Cir. 1972), "subject to the essential demands of fairness," *Aldridge v. United States*, 283 U.S. 308, 310, 51 S.Ct. 470–471, 75 L.Ed. 1054 (1931). The experienced trial judge in this case, after inquiring into the prospective jurors' and their families' acquaintances with the defendant and counsel and into their familiarity with the case from news reports, asked all prospective jurors whether they knew of any other reason why they could not give both the government and the defendant a fair and impartial trial. Hornsby did not state that he knew of any such reason. His post-trial affidavit does not state that he was prejudiced in any way.

Here, as in *United States v. Eastwood*, 489 F.2d 818 (5th Cir. 1973), the district court declined to ask prospective jurors specific questions regarding their feelings about or experiences with drugs or drugs users, but instead relied on "careful though general questions pertaining to the possibility of bias." *Id.* at 820. Here, as in *Eastland*, we think this course did not affect the essential fairness of appellant's trial and hence did not constitute an abuse of discretion. *See also United States v. Goodwin*, 470 F.2d 893, 897–98 (5th Cir. 1972), *cert. denied*, 411 U.S. 969, 93 S.Ct. 2160, 36 L.Ed.2d 691 (1973); *United States v. Gassaway, supra*, 456 F.2d at 625–26.

## III. *Instruction on Possession.*

■■■ Appellant next argues that, in view of the fact that he shared occupancy with two other persons, the district court erred in refusing to give his requested jury instruction that his mere physical proximity to cocaine hidden in a common room of the house was insufficient to establish the element of possession, either actual or constructive.[1] It is true that a defendant's

---

1. The instruction refused by the district court stated:

 In order to establish constructive possession the government must prove evidence showing ownership, dominion, or control of the contraband itself or the premises in which the contraband is concealed.

In other words, there must be some nexus between the accused and the prohibited substance. Proof of physical proximity to controlled drugs is not sufficient to establish either actual or constructive possession. Mere presence in the area where the narcotic is discovered or mere association with the

mere presence in an area where narcotics are discovered is insufficient evidence to support a conviction for possession. *United States v. Ferg*, 504 F.2d 914, 916–17 (5th Cir. 1974); *United States v. Stephenson*, 474 F.2d 1353, 1355 (5th Cir. 1973). Nonetheless, the charge given by the district court was sufficient, if followed, to preclude conviction for mere presence or proximity. The instruction correctly stated that in order to find possession, the jury must find that the defendant had either direct physical control or the power and intention to exercise dominion or control over the cocaine.[2] *United States v. Ferg, supra*, 504 F.2d at 916–17; *United States v. Stephenson, supra*, 474 F.2d at 1355. The instruction was in terms nearly identical to that given in *United States v. Gloria*, 494 F.2d 477, 483 (5th Cir.), *cert. denied*, 419 U.S. 995, 95 S.Ct. 306, 42 L.Ed.2d 267 (1974), which we upheld against the same objection. We hold there was no error in refusing the tendered instruction.

## IV. *Sufficiency of the Evidence.*

 Appellant's next contention is that the evidence was insufficient to support a conviction on either the possession or the conspiracy count. In considering this argument we must take the view of the evidence most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The test for sufficiency, whether the evidence relied upon by the government be direct or circumstantial, is whether reasonable jurors could find the evidence inconsistent with every hypothesis of innocence. *United States v. Moore*, 505 F.2d 620, 623 (5th Cir. 1974), *cert. denied*, 421 U.S. 918, 95 S.Ct. 1581, 43 L.Ed.2d 785 (1975); *United States v. Nazien*, 504 F.2d 394, 395 (5th Cir. 1974), *cert. denied*, 420 U.S. 964, 95 S.Ct. 1358, 43 L.Ed.2d 443 (1975). Having reviewed the record carefully, we hold there was ample evidence to support convictions on both counts.

With respect to the possession count, the jury could reasonably have concluded that the government proved appellant exercised the requisite dominion and control over the cocaine found under the chair. *See United States v. Ferg, supra*, 504 F.2d at 916–17; *United States v. Stephenson, supra*, 474 F.2d at 1355. Alfonso testified that although he himself never met appellant, Valdez had referred to "the old man" at the house as the source of the cocaine that they procured there on February 15. Appellant is nearly fifty years old, while the only other male living at the house, his stepson, was described as being in his early twenties; thus the jury could reasonably have found that Valdez referred to appellant and not his stepson as the source of the cocaine supplied on February 15. As the government's expert witness testified to a high probability that the cocaine purchased on February 15 and that seized on February 21 were of the same origin, the jury could

---

person who does control the drug or the property where it is located, is insufficient to support a finding of possession.

Where premises are not in the exclusive possession of the defendant, the government, in order to prove knowledge of presence of drugs, must present other evidence showing knowledge of the existence of the drugs and an exercise of dominion and control over the drugs beyond a reasonable doubt[.]

Appendix at 11–12.

**2.** The instruction actually given by the district court stated:

The law recognizes two kinds of possession: actual possession and constructive possession. A person who knowingly has direct physical control over a thing, at a given time, is then in actual possession of it.

A person who, although not in actual possession, knowingly has both the power and the intention, at a given time, to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.

The law recognizes also that possession may be sole or joint. If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint.

You may find that the element of possession as that term is used in these instructions is present if you find beyond a reasonable doubt that the defendant had actual or constructive possession, either alone or jointly with others.

Record Vol. II at 662–63.

have found further that appellant exercised dominion and control over that seized on February 21 as well. This conclusion could have been buttressed by Spencer's testimony that appellant personally produced a quantity of cocaine on the morning of February 16; by the discovery of scales suitable for weighing drugs in appellant's and his wife's bedroom closet; and by appellant's request after the search that Detective Hartzner leave him "half the stash."

█ We further hold that the evidence was sufficient to support appellant's conviction on the conspiracy count. "[O]nce the existence of an agreement or common scheme of conspiracy is shown—usually by inferences from relevant and competent circumstantial evidence—slight evidence is all that is required to connect a particular defendant with the conspiracy . . ." *United States v. Sanchez,* 508 F.2d 388, 392 (5th Cir.), *cert. denied,* 423 U.S. 827, 96 S.Ct. 45, 46 L.Ed.2d 44 (1975) (footnote omitted). Here the evidence was considerably more than slight that appellant, Valdez, and Alfonso had engaged in a common scheme to possess and distribute cocaine. The jury was free to infer, from the frequency of the transactions and amounts of the drug involved, appellant's knowledge and intent that the cocaine he delivered to Valdez would be redistributed. *See United States v. Sin Nagh Fong,* 490 F.2d 527, 530 & n. 3 (9th Cir.), *cert. denied,* 417 U.S. 916, 94 S.Ct. 2618, 41 L.Ed.2d 220 (1974). In such circumstances it is immaterial that appellant did not know the identity of lower links in the chain of distribution. *United States v. Agueci,* 310 F.2d 817, 826–27 (2d Cir. 1962), *cert. denied sub nom. Guippone v. United States,* 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963); *United States v. Rich,* 262 F.2d 415, 417–18 (2d Cir. 1959).

V. *Refusal to Declare Mistrial.*

█ Appellant's final contention is that the district court erred in refusing to declare a mistrial after the following exchange between the government's first witness, Detective Hartzner, and defense counsel with respect to who occupied the house at 3010 West Laurel Street:

Q: Detective Hartzner, the city directory also lists Melba Rojas as residing at 3010 West Laurel Street doesn't it?

A: I have no knowledge of that, sir.

Q: The city directory also lists Jose Garcia as an occupant of that home does it not, sir?

A: Mr. Antinori, the city directory could possibly have everybody in the city of Tampa, some people are in it and some people aren't. The only one I was concerned with at the time was Mr. Rojas.

Q: That's precisely my point. You only concerned yourself with Gerald Rojas as far as living at that house but you didn't find out everyone who lived at that house have you?

A: *Well, sir, he was the only one at the residence we had information on who was selling cocaine, we didn't have information on Jose Garcia and Melba Rojas, we had information on Gerald Rojas.*

Record Vol. II at 175–76 (emphasis added). Defense counsel immediately moved that the district court strike the last response and admonish the jury to disregard it. The district court did so. Defense counsel also moved for a mistrial, which motion the court denied.

There can be little doubt that Hartzner's statement, although arguably responsive to defense counsel's probing as to why only Gerald Rojas, Sr. was under investigation, smacked of "informant's hearsay" and hence was properly ordered removed from the consideration of the jury. *See, e. g., United States v. Gomez,* 529 F.2d 412, 416–17 (5th Cir. 1976); *United States v. Rodriguez,* 524 F.2d 485, 486–87 (5th Cir. 1975); *United States v. Vosper,* 493 F.2d 433, 437–38 (5th Cir. 1974); *McMillian v. United States,* 363 F.2d 165, 167 (5th Cir. 1966). The question here is whether the trial court's terse admonishment to the jury[3] was sufficient to obviate the need to declare a mistrial.

---

3. The trial court simply told the jury, "Disregard that remark." Record Vol. II at 176.

The general rule is that striking erroneously admitted evidence and admonishing the jury to disregard it serves to cure the error. *United States v. Vosper, supra,* 493 F.2d at 438 & n. 11; *United States v. Troise,* 483 F.2d 615, 618 (5th Cir.), *cert. denied,* 414 U.S. 1066, 94 S.Ct. 574, 38 L.Ed.2d 471 (1973); *Conner v. United States,* 322 F.2d 647 (5th Cir. 1963), *cert. denied,* 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 178 (1964).

To require a new trial, the prejudicial effect of improper matter, viewed in the context of that particular trial, must not be overwhelmed by evidence of guilt. A significant possibility must exist that, considering the other evidence presented by both the prosecution and the defense, the . . . statement had a substantial impact upon the verdict of the jury.

*United States v. Rodriguez, supra,* 524 F.2d at 487, *quoting United States v. Arenas-Granada,* 487 F.2d 858, 859 (5th Cir. 1973); *see Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

In the instant case we are confident that Hartzner's statement did not have a substantial impact on the verdict. The other evidence, reviewed above, clearly pointed to appellant as being a large-volume supplier of cocaine. Moreover, the attention of the jury was not again directed to Hartzner's remark. *See United States v. Ratner,* 464 F.2d 169, 173 (5th Cir. 1972); *cf. United States v. Troise, supra,* 483 F.2d at 618 n. 4. "An error that might be prejudicial in a close case does not require reversal when evidence of the defendant's guilt is strong." *United States v. Roland,* 449 F.2d 1281, 1282 (5th Cir. 1971). We hold that the district court did not err in denying appellant's motion for a mistrial.

AFFIRMED.